May it please the court, Susan York on behalf of Vincent Powell. Hold on just one second. Waiting for your opposing colleague. I don't know if she's there yet. Let's see. I'm here, your honor. Oh yeah, there you are. Okay, there you go. Okay, very well. Okay, Ms. York, please proceed. May it please the court, Susan York on behalf of Vincent Powell. I'd like to save five minutes for rebuttal if possible. I'll try to help you, okay? The trial court in this case first found Powell incompetent. After he underwent court-ordered treatment, the trial court then found him competent, based in large part on a stipulation from defense counsel. Months later, defense counsel alerted the court that Powell's condition had deteriorated, and counsel repeatedly requested a new hearing. The trial court apparently recognized that there was cause for concern, but it tried to address that concern by reaching out ex parte to a jail doctor to get more information. Instead of holding it. But counsel, the trial court had innumerable reports from evaluating physicians that first said we need to rule out malingering, and then diagnosed your client as malingering, and the judge had many, many opportunities to observe your client. I think the record may have said eight specific times, and there are, to me, it seems like there's overwhelming evidence in the reports of behavior entirely consistent with malingering. Why is the fact that the jail reached out to the judge to say that your client wasn't suffering mental problems from the lithium? Why does that somehow mean that the judge did something constitutionally wrong here? Because the standard here is that a new competency hearing is required whenever the judge has a doubt as to competence, and the fact that the trial court reached out here for more information suggests that before the trial court could decide whether to continue with trial, it felt like it needed more information. In other words, it did have a doubt. So counsel, I may be confused here. Where in the record does it indicate that the trial court reached out to the Pima County Jail? I'm looking at the minute entry notes where it says that he received information from, I believe it was Dr. Bishop, and the transcript says that, but I don't, maybe I missed it, but I don't see anything where the judge said he was soliciting Dr. Bishop for information. Certainly. So actually the judge had ex parte contact with the jail twice. The first time was on July 28, 2009, which was the date that the first trial was originally scheduled to start. And there, the transcript from that hearing, the judge says, I'm going to call the jail over the lunch hour. And then the judge does call the jail. He talks to someone named Bill Lane or Tom Lane, the court refers to him by both names. And he finds out information about when Powell's medication, when his lithium was discontinued, what effect that might've had on his competence. So that was a standalone ex parte reach out by the judge over the lunch hour. I can find the exact transcript site for you during rebuttal, if you would like, but that's on 7-28. And then on Dr. Bishop. And I think the inference is quite clear that he reached out and sort of solicited information from Dr. Bishop at that point. I was just going to say what constitutional, what Supreme court case says that in, when a judge is dealing with the alleged competence of a malingerer, that a judge can't rely on prior reports and his own experiences to decide as a matter of fact, based on everything that's come before that the defendant is simply trying to delay trial. Like on the day where he's talking about the letter from Dr. Bishop and your, your client is talking about, he wants his mommy there to take him to the IHOP and he's hungry and he hasn't had anything to eat in 10 years. And the court says, basically, this is just the same acting out what, what constant, what Supreme court case says, the judge can't look at this and say, this is not different in nature or kind from what I've seen before. This is just more evidence of malingering. I'm not going to delay the trial. So I think both Pate and DROPE stand for that proposition. In Pate, the court relied on its observations of demeanor to say that it thought that the defendant was competent. And the Supreme court said that in the face of other objective indications of incompetence, those demeanor based observations were not good enough. What is it? What, what here is the with the mask of protection, which in the recorded call he had laughed about with somebody and apparently had used before. What's the objective evidence here of incompetence? So even setting aside Powell's behavior, I think there are two really important objective pieces of evidence here. The first is defense counsel's representations to the court about her, that her client, who she had the closest contact with that his condition had changed. And those representations are particularly important because defense counsel initially was equivocal about competence. And then she eventually stipulated that Powell had been competent in early 2008. But when defense counsel alerts the court that there are changes here, Supreme court case law is clear. This is DROPE that this is unquestionably a factor the court must consider. And Medina, another Supreme court case says that defense counsel will often be in the best position to a sense, assess her client's competence. Well, I don't, I don't see where the, where the court didn't consider it. I, this is, this is where your, your client is, is talking about how the counsel was the police officer who arrested him in the past. So the Arizona court of appeals doesn't address this factor at all. It doesn't acknowledge that that factor exists and it doesn't address it. And that is the decision that this court is reviewing under EDPA to determine whether it was reasonable. And it was unreasonable as a matter of both law and fact for the Arizona court of appeals to not even acknowledge or address that factor, but that's not the only objective. Oh, I'm sorry. That's not the only objective indication of incompetence here. The other objective evidence is both the amount and type of medication that Powell was on at the time of trial and the undisputed changes in that medication on the eve of trial. So the information that the trial court had was that Powell's lithium had been discontinued. The trial court knew that there was some confusion as to date the date that that had happened, but that it was quite recent before trial, that he had suffered physical side effects as a result of the amount of lithium that he was taking and that he had been started on a new medication, Lamictal, that he had never taken before. So there's changes in medication. And then the third objective indication of incompetence here is that the prior competency report by Dr. Joseph, that final competency report did not diagnose Powell with bipolar disorder or a psychotic disorder. In fact, that report didn't diagnose him with any major mental illness, but the trial court knew at the time of trial that Powell had been receiving lithium for bipolar disorder. And he also knew that Powell was on an antipsychotic, suggesting that jail treatment staff had diagnosed Powell with bipolar disorder and a psychotic disorder, which is in direct contradiction to the prior competency report. Let me change just a little bit here. Unlike in the Maxwell case, your client was never placed in involuntary psychiatric hold. Why shouldn't that distinction control this case like the Arizona Court of Appeals found? Is there any evidence for your client not present in Maxwell that strengthens his case here? I think, so I will say Powell was sent to court-ordered treatment initially. He was initially found incompetent. As an involuntary psychiatric hold? He was ordered by the court to the state hospital for treatment, and there was a forcible medication order. It is not the exact same as an involuntary psychiatric hold, which occurred in Maxwell. But he was subject to a court-ordered medication order and to court-ordered treatment. Another, I think, interesting thing is in Maxwell, the trial counsel did not request a new competency hearing. Whereas here, trial counsel repeatedly requested a new competency hearing. So that's a piece of evidence of incompetence that is stronger in this case than in Maxwell. Also in Maxwell, four of the five evaluations definitively concluded the petitioner was malingering. Whereas here, there were three evaluations as to competence at the time of trial. And those evaluations, one concluded he was incompetent, one the trial court characterized as basically can't make sense of what's happening, and one concluded that he was competent. But that was before the restorative treatment, right? Two were before the restorative The one that concluded incompetence was before the restorative treatment, right? No, your honor. Oh, yes, yes, your honor. I'm sorry. Yes, that's correct. One before the restorative treatment concluded incompetence, one was undetermined, and then one after restorative treatment concluded that he was competent, but that was nine months before trial in the second case. Counsel, with respect to your reliance on Maxwell, hasn't the Supreme Court repeatedly said, both respect to your circuit and my home circuit, that we can't look to circuit expressions of principle to meet the EDPA standard, that we have to have a Supreme Court case that is relatively on point, and isn't one of the big differences with Pate, which of course is 55 years old, is that there was no hearing at all, and no real consideration. Whereas here, for right or wrong, this judge was thoroughly involved and engaged in it. He had an initial hearing and had his own observations, so can you really get much comfort from Maxwell? Well, I believe in Maxwell there was an initial hearing. That's where four of the five evaluators said that. But what I mean is that you can't really get much comfort from a circuit decision as to what the Constitution says, as opposed to Supreme Court decision. So Pate and Drope, and to some extent Medina, but are the clearly established law here. But Maxwell was a post-EDPA case. In other words, it's an exact same type of procedural posture as here, and it was applying EDPA standards. So it is binding on the question, both of whether Pate and Drope are clearly established law in this context, and the court says that they are. The court also said that much more recently. They're clearly established law, but what they establish can't be established by Maxwell, can it? I think circuit precedent can, to some extent, clarify the application of EDPA in this context, and I think Maxwell is helpful for that, as is Anderson. But the clearly established law here is Drope and Pate, and Drope actually is quite on point and makes some very clear points that I think are important here, particularly about the critical nature of counsel's representations and impressions of defendants' ability to stand trial, and about the standards that are applied, and about the fact that we don't defer to prior findings of malingering, necessarily. You want to save any rebut with that, okay? Thank you, your honor. Okay, let's hear, please, from Ms. Damstra, is that correct? Damstra, yep, just like you're swearing, your honor. Very good, we like doing that. Good afternoon, your honors. Catherine Damstra for the state of Arizona, and the respondent, Mr. Shin, in this case. Here, the Arizona State Court's application of Drope and Dusky and Pate were not unreasonable, nor were the decisions unreasonable in view of the facts presented in this record. The determinations of competency are based on the facts known at the time that that determination is made, which is right out of Drope. It says that the court determines competency based on what is then known to the court at that time. So, when looking at some of the post-competency hearing materials that were presented, really are beyond this court's consideration in this case, because they were not present when the trial court made its initial determinations. Counsel, what specific points raised by the defense do you refer to in connection with something the court would not have known at the time? Well, actually, the post stuff really doesn't do much for the defendant's position. What he put in post in connection with his Rule 32 were a lot of articles about the potential side effects of lithium and some of the other drugs that he was taking, but nothing that connects it to him. But the other points made by Ms. York are quite different. Of course, she her big challenge is the malingering issue here. Would you, in part of your argument, address the importance of that particular issue? Yes, Your Honors. Most of, all except, I believe one of the examiners, including those at ASH, found that he was either malingering or exaggerating as it was part of each diagnosis. And so, that does color somewhat what the trial court is looking at. But the trial court also has known this defendant for over a year. And so, has it had the opportunity to get to know him, to look at his demeanor, to understand what he's saying and doing and how that's relating to his competence or lack thereof. Counsel, to that point, at ER 357, in connection with the sentence, the trial court said, well, there is no doubt, Vincent, that you have got a mental illness. I mean, there is no doubt. Now, here's the judge himself acknowledging that the defendant has a mental illness. What role, if any, should that play in our deliberation? Well, Your Honor, there's a distinction because Mr. Powell is mentally ill, does not necessarily mean that he's incompetent. The two are really separate inquiries. One can be both mentally ill and competent to understand the proceedings and to assist in the defense. And that was the whole point of the restoration to competency, was to get him under the correct medications to begin him to be able to assist in his own defense. The change in medication did cause some concern for the trial judge. When Vincent went in on the 28th for that first day of trial, the judge could see that he was visibly, physically distressed and emotionally distressed and not his usual self. The judge even said at some point during that hearing that, I know Vincent, this isn't the way he is. He was bloated and physically uncomfortable. And when he had declared the mistrial because of what had happened in the change in medications before proceeding again on August 4th, the judge did reach out to the jail to make sure that that change was not going to impair their going forward and was assured by Dr. Bishop from the Pima County Jail that he was at that point stabilized, that the lithium was out of his system at that point in time and that he could go forward with trial. And that if he chose to misbehave at that point in time, then he was choosing to misbehave. And defense counsel did not object to the ex parte nature of that, nor did she ask to cross-examine Dr. Bishop or have any concern about the Powell's symptomology continuing. Nothing was new in the world. I mean, maybe he was doing some acting out in front of her that he hadn't done before, but there were always these inconsistencies when he was dealing with the professionals. In fact, his test scores done by Dr. Alender and some of the doctors at Ashe, as well as Dr. Johnston, showed a distinction between his actual condition and what he was trying to portray during treatment and to the treatment facilitators and evaluators. And counsel, that's the actual definition in part of malingering, uh, the intentional production of false or grossly exaggerated physical or psychological problems, right? That's correct, your honor. And the mask, as you noted earlier, the mask of protection had dealt with, had came, come to be in May of 2008. So by May of 2009, when it shows up again, it's nothing new. He'd been, he'd done that before. He did it up at Ashe. It was one of his consistent behaviors as was the self, the self-harm, which Dr. Johnson, at least one other provider, I can't recall off the top of my head, believed to be due to a personality disorder, which is not amenable to treatment and certainly doesn't make him incompetent to assist trial counsel. And Dr. Joseph's report discusses the likely personality disorder as well, doesn't it? Yes, it does. At the very last page of her report, she discusses the personality disorder. And also in the middle, I believe when she's talking about Dr. Koreshi up at Ashe, who also had that same impression that that was a personal personality disorder and not something that could be dealt with. Counsel, with respect to the due process claim, I'm a little troubled by the fact that we've got a series of, if you will, actions by Powell that bear some resemblance to some of our other cases. For example, his demeanor at trial, similar to Anderson and McGregor, his repeated, the repeated objections from his counsel about his conduct and the inability to work together, his self-harm, which is similar to McMurtney, the medication issue, which has been discussed by both of you in the following counsel, the psychiatric reports. What I'm struggling with is there are elements of this case that are like other advocate cases where relief has been granted. Yet on the other hand, I see an enormous amount of evidence about the malingering. Help me to balance that in terms of how we review these issues under AEDPA. Under AEDPA, your honor, really it comes down to really an evaluation of his demeanor and his credibility. And in those cases, as in like Thompson v. Kino, I believe is the name, the last to the trial court judge and the state courts who had the firsthand observations of Mr. Powell. And in that situation, the fact that this judge dealt with him for over a year, knew him and dealt with him and so on, does that carry the day? Obviously under AEDPA, we're supposed to defer to the state court unless it's unreasonable. And if it's unreasonable, is there any question of whether reasonable people can disagree? Is that not correct? Yes, your honor, it is correct. But really in deference to the state court, at this point, we're second guessing the second guessers, which is really troublesome when you're dealing with someone's mental health and being away from the people who were hands-on. I understand counsel's stated, but that's only one factor among many that the court is to consider. And certainly, Powell could have decided to act up more so with counsel than he had in the past, as was his history with the doctors and his healthcare providers and in the court. The trial court, on each day of trial, gave Powell the opportunity to come into trial. He gave Powell a chance to come in and Powell repeatedly refused, not violently, not irrationally. He just would say, no, thank you, I'm not coming. And so we have to look at the entire picture. There's no due process violation when the court is checking with Powell on a daily basis. Do you want to be here? What chokes the scales? As I mentioned before, all these things that are similar to some of our cases, then you've got the malingering, the judge is seeing Powell over a period of time. Is there a presumption of any kind? We've got kind of an equipoise here in some respects. What tilts the scale? Well, I believe what tilts the scale is the consistency in the mental health professionals' reports with the consistencies of what's been observed by the trial court judge of Powell and his behaviors and demeanor. So we have a consistent, I don't want to use spiel, but some symptoms that show consistently throughout this whole proceeding. They don't elevate, they don't get worse, they're just the same. And they've all been attributed to this malingering and exaggeration that all the professionals, except for Dr. Morenzon the first time, had found. So counsel, you would concede that we might be in a different circumstance if right before trial or some particular day, the symptoms that a defendant was exhibiting are completely different, are new in type, in kind, not consistent with prior diagnoses. That has to give a judge more pause, but your view is that's not what happened here. That's correct, your honor. It was just kind of the same symptoms and acts showing up again and whether, lost my train of thought there, excuse me, your honors. But the consistency in what he did and what the professionals observed and the tests administered over the course of several months showed that he was trying to game the system, which is also what showed up in the phone calls that Dr. Joseph referenced early on before the first competency proceeding even came to light. So he was trying, it was pretty clear that he was from the onset trying to game the system here and was going to put on a show, seems a little crass, but trying to do what he can to avoid prosecution for what he knew was going to result in a life sentence at this point. So he's, you know, upped his game as trial got closer, you know, except for on July 28th when there was actually bona fide symptoms of physical discomfort that needed to be addressed by the trial court judge and were appropriately addressed by the court. That's the lithium incident, right? Yes, that's correct, your honor. It's not real clear exactly what day that that was ceased, but by the time he went to trial on August 4th, and certainly by the time of trial in 2010, you know, Dr. Bishop had assured the trial judge that the new medication had kicked in, that he was much better physically and emotionally, and that if he chose to behave at that point in time, he chose to misbehave. And if your honors have no further questions. I guess I just have one other question. Yes, sir. Connection with the due process challenge. I guess the question isn't so much whether he is competent, but whether he's entitled to a hearing to determine his competence. Do you agree with that? Yes, your honor. That is it. And the judge has the discretion to decide to do that. He did not have, at that point, a bona fide doubt about Vincent's competence at any of those junctures, because he was just seeing more of the same symptoms. So there's no bona fide doubt about whether he has become incompetent. And that's the standard, whether the judge had a bona fide doubt. Is that correct? Yes. Whether he had a bona fide doubt about the continued competency of Vincent. If he did, then he was bound to hold a new competency hearing. But the judge never found, or never held a doubt, and that was reasonable, given the evidence that he had. Okay. Let me ask my colleague whether either has additional questions for Ms. Damsgrove. Okay, your honor. So we ask that you affirm the district court's denial of the habeas petition. Thank you. Thank you. So Ms. York, you have a little rebuttal time. Thank you. I'd like to start where opposing counsel left off. She concedes that if the trial court had a bona fide doubt as to competence, it was required to hold a competency hearing. I'm not sure how you explain the trial court's decision to reach out to the jail not once but twice to find out more information about the medications that Powell was receiving, when those had been changed, and specifically the effect that that could have had as to his competence. I don't know how you explain that decision, if it's not a desire to get more information. Counsel, can't you explain it by a judge wanting to make sure that every possible loose end is covered? Not that I have a constitutional doubt about competence, but I want to make sure that I'm looking everywhere I should. I think the case law is clear that if a judge feels that they need more information to be certain about that, they need to hold a new competency hearing. It's black and white. There's no discretion. That is the Supreme Court standard. Couldn't the inquiry of Dr. Bishop have dealt exclusively with the issue of the lithium dosage? They dealt with the question of when lithium was discontinued and the effect that the jail personnel thought that would have on Powell's competence, which I will also note presumes that the judge was thinking that lithium was maintaining Powell's competence. Again, lithium was for bipolar disorder. The judge said that, but the final competency report, which the judge was relying on, said that Powell did not suffer from bipolar disorders. Again, this suggests not only a change in medication, but a change in diagnosis that the trial court was aware of at the time. I want to point out a couple of things about what opposing counsel said about consistency, both that the reports were consistent and that Powell's behavior was true. The one consistent thing about the evaluator's reports here is that they found Powell hard to evaluate. Some evaluators said his self-harm was far beyond what would be normally happening with a malingerer. There really wasn't consistency between the reports. There also wasn't consistency in his behavior. This was the first time he had had to be restrained in court. It was first time he refused to participate in court proceedings. Prior to the competency determination, he had never expressed paranoid delusions about his attorney. What's the case that you would point us to that best describes when a trial judge has a bona fide doubt about the competency of an individual? Here we know everybody agrees he had mental illness. The question is competency. What case tells us what the criteria are for bona fide doubt? I think the best case from the Supreme Court is Droop. And from this court, I would recommend Maxwell, but also this court's decision in Watts, which is an unpublished case, but I think quite analogous in facts and also helpful in understanding what was unreasonable about the court of appeals decision here and what was unreasonable about the contradictions that you pointed out, Judge Smith, between the trial court's own findings here, both that he didn't suffer from a mental illness and then at sentencing that it was the psychotic and ill Vincent who had committed these crimes and that there was no doubt he was mentally ill. Counsel, if I could ask you about the sort of follow-up on the same thing of is there a difference between some doubt and bona fide doubt? You emphasize the reaching out to Bishop, but by the time the judge agreed to have the trial go forward, he had those answers and he had his observations. So how can you say that simply the reaching out, you have to stop the clock at that point in effect, rather than saying he got all the doubt at the crucial time, or are you arguing that anytime you have quote any doubt, then you must have a hearing without asking for more information. Anytime you have a bona fide doubt, you must have a hearing. And so to the extent that a bona fide doubt, even if it's five minutes on Wednesday, if on Thursday, the doubt has disappeared, you still should have had a correct. And I think the doubt here persisted at least from the 28th to the 4th. And it's also just finally worth noting that there never was a contested competency hearing in this case. The initial finding of incompetence was stipulated. The initial finding of competence was stipulated. So this is not a case where there have been multiple contested competency hearings. There never has been one. So Powell received, sorry, I don't want to go over too much further. Oh, that's all right. Go ahead. You're answering the judge's question. Okay. So yes. So my position would be that as soon as a bona fide doubt arose, the duty to hold a competency hearing was black and white. There was no discretion that's under Supreme Court law. The failure to do that violated due process. And the Arizona Court of Appeals essentially just sort of dismissed a lot of the relevant factors that Supreme Court case law required it to consider. It also mischaracterized the record that was unreasonable as a matter of both facts and law. And that decision is not entitled to deference. Very well. Other questions by my colleagues? Hearing none, we thank both of you, counsel, for the fine job you did. Very helpful in understanding the relative position. The case of Powell versus Shin is hereby submitted. Thank you, your honor. Thank you. And we'll go to the last case of the day, which is Espinosa-Molar versus Barr.
judges: Boggs, M. Smith, Bennett